The next matter on our calendar is 7 West 57th Street versus Citigroup and others. Everyone else, actually. Thank you. Good morning, Counsel. Good morning, Your Honors, and may it please the Court. The District Court erred in dismissing plaintiffs' RICO and antitrust claims, and we urge this Court to reverse and remand. As alleged in the complaint, for a brief period of time in the fall of 2008, the defendants colluded to artificially inflate LIBOR, a benchmark interest rate that has predictable and direct effects on other financial instruments. That artificial inflation of LIBOR directly caused the value of plaintiffs' bond portfolio to drop. That bond portfolio was pledged as collateral for LIBOR-denominated loans from defendants. Citibank . . . Those bonds were not pegged to LIBOR, right? That's correct, Judge Chin. Explain how the scheme affected the value of the bond portfolio. Of course. So bond investors are generally yield investors, and yield investors want their bond portfolio to pay an interest rate that matches current interest rates. And so as LIBOR rates go up, interest rates go up, and the value of bonds that pay out a lower interest rate goes down because the yield is a function of the price you pay and the par value and the current interest rate. So if you're buying a lower interest rate bond, you have to pay a lower price to get the yield that you want. But they're one step away from the direct effect of LIBOR on this bond portfolio. Isn't that correct? Well, the bonds are. And we're not saying that any holder of a bond that dropped in value because of the inflation of LIBOR would have antitrust standing to sue. What we're saying is that that was a direct effect of the inflation of LIBOR, and then one of the price fixers used that effect of its market manipulation to profit from the plaintiff, right? So Citibank had issued LIBOR-denominated loans to the plaintiff that had these bonds pledged as collateral. The value of the collateral dropped as a direct effect, as alleged in the complaint, as a direct effect of the upward manipulation. And then one of the price fixers used that effect to foreclose on the loan and profit. And the defendants have not identified any case in which a direct victim of an action of a price fixer doesn't have antitrust standing to sue. And in fact, it's remarkable, they have not identified any other type of plaintiff or specific plaintiff who would be a more efficient enforcer with respect to the inflation.  Wouldn't a person who had LIBOR-denominated bonds be a more efficient enforcer? Only with respect to the suppression of LIBOR. I don't mean to interrupt you, but, and as you... That's the question which you anticipated. Right. So as you well know, most of the plaintiffs in the MDL LIBOR cases are suing with respect to the suppression of LIBOR. Those are people who primarily had LIBOR-denominated bonds. They allege that they received lower interest rates on the bonds because LIBOR was suppressed. Here, what we're talking about is LIBOR inflation. Now, those people would have benefited from LIBOR inflation because they would get higher interest rates. And so they would not be efficient enforcers. They would not have standing to sue with respect to these anti-competitive acts. And the defendants haven't identified anybody. Isn't it odd that some plaintiffs are arguing suppression and other plaintiffs are arguing inflation? I mean, can we have both? Can there be viable claims based on both, inflation and suppression? You certainly can. I mean, this Court has held that the plaintiffs in the MDL cases have validly alleged a conspiracy to manipulate LIBOR to gain profits. Now, some of the admissions that have come out of the government investigations have been the banks themselves have admitted that they colluded to artificially inflate and depress or keep the same LIBOR to benefit... Depending on what their marketers want. Their needs of the moment is what they said. The needs of the moment in this instance in the fall of 2008 was that the banks needed cash, right? So here the allegation is that they artificially inflated LIBOR. It caused the value of the bonds to fall. And Citibank capitalized on that by taking the collateral and selling it and getting cash and then suing the plaintiff for the balance. And the other claim where you do have LIBOR-denominated bonds, you're claiming that LIBOR increased and you suffered as a result of that. Well, the LIBOR-denominated loans, yes, not bonds. Yes, yes. So the plaintiff ended up paying more for his loans in two ways. First, he paid a higher interest rate because the interest rate was indexed to LIBOR. And second, he had to pay more collateral because the value of the pledged collateral fell as a direct result of the manipulation of LIBOR. So we think the district court said that the plaintiff wasn't an efficient enforcer because he didn't have direct dealings with the bank. Well, that's just factually incorrect. His injuries don't come just from the depreciation, the temporary fall in the value of the bonds. If he had just been able to hold those bonds, they would gain their value within a couple of months. His injuries come from his direct dealings with one of the price fixers. The success of- What about the Ray Giudicata argument? This loan was litigated in the state court system and it was found to be commercially sound. Don't these claims now go right to the validity of the loans? They do. And so we're not saying that these are unrelated claims. But what we're saying is that there was fraudulent concealment on the part of the defendants. This court held in Schwab last year, as you know, that the same type of scheme, that plaintiffs were prevented from learning about it until at least the middle of March 2011. The district court below held in this case that there was fraudulent concealment, and so the statute of limitations was told, and even with respect to Ray Giudicata, that the plaintiff was not put on notice inquiry until at the earliest, March 15, 2011. But then the district court held that within nine days of the beginning of notice inquiry, the plaintiff was required to assert its RICO claims in the state court proceedings. Well, that's just impossible, basically. The beginning of notice inquiry doesn't even begin the statute of limitations period. That doesn't begin until a point later when a plaintiff knows or has reason to know of his injury and his cause of action. Here, as alleged in the complaint, and this must be taken as true at this point, the plaintiff didn't have knowledge or reason to know of his cause of action or his injuries until after he had satisfied the state court judgment in May of 2012. You can see from just looking at the complaint in this case, all the work that has to be done between being put on notice inquiry in a case like this and bringing a valid cause of action. The plaintiff needed to find counsel who knew about these actions, needed to hire economic experts, the economic experts needed to gather information about the relevant markets and interest rates and then do an analysis. Here, the defendant filed this case 23 months after the beginning of notice inquiry, and even now the defendants are saying, oh, it doesn't have enough detail, it's not sufficiently particularized. They haven't suggested any way in which that could have happened in the 9 days between March 15, 2011 and when final judgment was entered on March 24, 2011. So we think that the district court's decision on the residue to cut it just doesn't make any sense at all. There were some events that would have provided notice, at least arguably after the complaint was filed, but before the proceedings were completed in the state court system? I mean, are those included? Do we look at those? Well, not at the motion to dismiss stage, Your Honor. You know, this court has held, including in BPP Illinois. Well, I mean during the state court case. In other words, there were public revelations before the state court system was . . . lawsuit was completed about the . . . Before the appeals were completed? Yeah, before the appeals were completed. It's true, but a plaintiff can't be expected to bring a claim, a cause of action, until he either knows or has reason to know about it, and even then you're given some time to put your case together. You have to make an application to amend to add the new allegations. Right, and I think the more important point is that the point at which a plaintiff, through reasonable investigation, should have known about these claims, that's a factual question, and this court has held, including in BPP Illinois, that a plaintiff doesn't need to plead reasonable investigation or reasonable diligence in a complaint in order to establish fraudulent concealment. So, you know, that is an issue that can be litigated as the case goes forward, but at least at the motion to dismiss stage, we think the district court clearly erred in dismissing both of these claims. Thank you. We reserve two minutes for rebuttal. We'll hear from Citibank, and are you representing all the banks or just Citibank? Yes, I am, Your Honor. May it please the court, I represent all the defendant appellees here. The district court should be affirmed because it correctly held that Mr. Solo's antitrust claim cannot proceed because he does not meet the efficient enforcer requirement and his RICO claim is barred by race judicata. So he was not the efficient enforcer on his bond collateral injury, but what about his interest rate injury? No, Your Honor. If you look at the factors for the efficient enforcer, the first one is clearly not met here. Mr. Solo's too indirect because his bond was not pegged to LIBOR. His bond is the value that fell. So to play out the chain, under the allegations, you'd have to have the banks conspiring to do inaccurate submissions, then the LIBOR being set. But then after that, that LIBOR rate has to somehow generally affect the interest rate. And then the interest rate somehow generally inversely affects the bond, but not at all, even under the allegations, to any one-to-one ratio. After that, then, there was a margin call. And then there was a margin call that couldn't be met by Mr. Solo. Then after that, there was a default. Then after that, there was a sale. And only after that would you have interest on it. So all of those steps removed are too attenuated of a chain of causation, and particularly when you look at this idea of there being more efficient enforcers. But what about, I may tend to agree with you on the collateral, on the bonds as collateral, but what about the interest rate, which was denominated a LIBOR rate, wasn't it, on his loan? First of all, as far as the loan allegations that they make, there's no allegations that there were any loan payments during the relevant period. There's nothing like that in the brief. And, of course, there have to be allegations to meet for the motion to dismiss. And then also on the amount for the interest rate default, which was the other LIBOR, again, that's even further attenuated than the bond because that only arises after the bond, the default, the margin sale. So in that, that chain of causation is even further. I would also point out on all of these, of course, these issues have been litigated through race judicata. I would also point out, Your Honor, that there's this speculative nature of the damages, and it goes back to the point I was just talking about, that it's not a one-to-one. It's been litigated and found that LIBOR was manipulated, correct? No, in the state court it was found that this sale of these bonds and the interest rate and all of the payments, that was all adjudicated, including that default interest rate in state court, and there's a judgment on that. So that is race judicata. They're trying to get out of the race judicata now by trying to argue fraudulent concealment. Fraudulent concealment, first of all, was forfeited. And it was litigated not with these parties, though. Certainly with Citi and Solo, with every incentive under the doctrine of race judicata to raise every argument. Solo wasn't a party, was he? Yes. In the state court he was? Yes, yes, he was the defendant. We sued Mr. Solo to get back the additional $11 million or more that were not met by the sale of the bonds, the bonds that were not LIBOR-pegged, and all of that was litigated in state court. So before I turn to the race judicata, which I think is a good point, I think in addition to affirming the district court's efficient enforcer ruling, it's very important here because this court, of course, in the earlier Galboym case, talked about even there where they were LIBOR-indexed instruments, which would account for anything that plaintiffs have talked about here. It was a very serious consideration about the causation and the chain there. And, of course, in the Schwab case, it wasn't an antitrust case, but it was a common law fraud. This court held there that non-LIBOR-indexed were too far removed and that there was no proximate causation. So when you look at the facts here, you understand that the precedent of the efficient enforcer and how the bonds are at the core here and the other two allegations they try to make about labor-pegged have already been adjudicated and are even further removed, that here the efficient enforcer should be affirmed. What about on the interest rate injury that Mr. Solow claims on his loans, which were LIBOR-related? There are three points on that. First of all, it was litigated in state court, and this was never raised. They do litigate that interest rate there. The state court was about his collateral. This was loans he had taken out. Oh, I'm sorry, Your Honor. I thought you were talking about the interest rate. The loans that were LIBOR-denominated. On the LIBOR-denominated loans, there is no allegation in the complaint that there was any loan payment due during this period in which they're alleging the manipulation. And that is not the injury that they claim arose from the default of the bonds. All of that comes through only because Mr. Solow did not meet the requirement to maintain a minimum amount of collateral of these bonds that were not LIBOR-pegged. After that, there was a margin call. The margin call wasn't met. After the margin call wasn't met, then there was a sale, and it was a sale or loss. Only after all of those steps would these other issues arise. So, Your Honor, we think that that is so attenuated that under Gelboim-Schwab, it clearly does not meet that standard. I'd also like to address the Twombly point, though, if I may. Here, the plaintiffs fall far from stating a plausible. The district court didn't pass on plausibility, did it? They did not, but this was an issue that was raised. Why did it be passed on here? In both Gelboim and Schwab, for example, there were issues that were raised below that the court had not ruled on, and they were addressed as alternative grounds for affirmance. In Schwab, it was the question of causation after there had been a fraud on the market that wasn't affirmed. And then in Gelboim itself, the question of whether there was a conspiracy. It's different than personal jurisdiction because personal jurisdiction . . . I want to go back to the question that Judge Poole asked. If the LIBOR rate was manipulated upward, which depressed the bond that was then taken by Citibank and liquidated, is that correct? At some attenuated level, there's no allegations that there was any kind of one-to-one effect, and there are many other market factors that would affect that rate. And that's part of the efficient enforcer also because of the speculative nature of the damages. But let's assume that that happened. Let's assume that happened. Wouldn't that then create an upward pressure on the payments that would do on the lending? In fact, their arguments are inconsistent, Your Honor, because if you even look at, for example, the LIBOR-pegged default interest rate, part of the time they would have been significantly advantaged by that. And for about two years before they satisfied the judgment, and arguably that would offset anything that happened within the seven-week period. So, yes, that's why these arguments and allegations just don't make any sense. Would that make them less an efficient enforcer if they are standing to benefit from one result of the manipulation and to be burdened by the other? Certainly, Gelboim identifies for us, as does the Schwab case, talking in a different context, but talking about those who are involved in LIBOR-pegged instruments that had direct relationships with banks. Still, there are serious questions there, as the Gelboim court pointed out and the district court has held. But here is the easier case. Every ripple. They didn't have two hats in that case. Well, every ripple that can possibly be affected by an interest rate. Under the limitless view of plaintiffs, anyone who had an interest rate affected in a financial instrument could be a plaintiff here. And that is not what the antitrust laws are about. They had loans that were LIBOR-pegged, and that's what I was asking about. When I ask about that, you turn to the bond collateral. I view them as separate claims. But their claim here is not rooted in any injury having to do with a loan. Their injury in their complaint is focused and rooted in the valuation of the bond going down. Well, I'll ask counsel, because I read it differently. I thought they did make a separate claim as to the interest rate injury, which was pegged to LIBOR, and LIBOR was pushed upward illegally during this period. That's what they claim, unless I'm misapprehending their complaint. They will tell me. But on the interest rate on the loan, they would have been benefited by that. They're claiming on the interest rate on the default, which also is so attenuated and has already been litigated. If I could just address for a moment race judicata, we think that's a very strong basis for not just affirming the dismissal of the RICO claim, but affirming the dismissal of the efficient enforcer. The fraudulent concealment argument was not raised in response to the race judicata argument. It was only raised in response in separate briefs to the statute of limitations, and for good reason. They're very different time triggers. The statute of limitations was a four-year time when this suit was brought in February 2013, so February 2009 was the trigger. Here, the judgment was not entered until March of 2011. As Judge Chin pointed out, the judgment was not satisfied until May of 2012. There was abundant information in the public that a sophisticated, in particular, real estate developer like Mr. Solo, would be well aware of. The MDL-LIBOR-indexed case was- The appeal law gives a remedy to seek relief from the judgment. Absolutely. Provided the time is satisfied. Certainly. I hesitate to claim any expertise in New York law when I know there are former members of that judiciary here, but under both 2221 and under 5015, you can reopen motions. And unlike federal court, there is no barrier to doing that while there is a matter on appeal. So they had more than a year after the MDL-LIBOR-indexed litigation was already pending to have brought this to state court. I think the federalism concerns reinforce the interest in race judicata typically for the finality or for the judicial resources to be used efficiently. The last point I would just make is the Twombly point. Even though it wasn't reached below, it was fully briefed below and fully briefed in that court, and the implausibility of this just is obvious from being said. The allegations here are that 16 international banks conspired on a daily basis, not once, but every single day for the period of seven weeks to inflate their LIBOR submissions. To inflate LIBOR submissions, as plaintiffs allege, would undermine the public perception of their financial stability. And when were these 16 conspiratorial banks doing this to inflate LIBOR at the height of the financial crisis? And in sudden, a 180-degree turn from all of the other allegations that this was to be suppressed. And also, there's no allegation that all of these alleged conspirators were benefiting from the valuation of one bond that wasn't pegged to LIBOR, the allegation is city, but even there it's so attenuated to think that a non-LIBOR-indexed bond and the subsequent calling for the margin, whether Mr. Solow could meet that margin call and what would happen when it was lost, all of those really to state it. And the last point I would make, Your Honor, is to accept that theory would be to totally disregard the close analysis that the court did in Gelboim. To even look there to see where there could even be a plausibility of a conspiracy. And there it was because they said, well, at least it meets the standard because there was this idea that because of the financial security, that perception. This would be directly contrary to that. Thank you, Counsel. Thank you, Your Honor. All right. Did I misapprehend the complaint? Aren't you making a separate claim on the interest rates? Well, Judge Pooler, what we're saying is that we were required to pay more for the loan. There were two aspects to that. One was the increased interest rate that was LIBOR. Do you divide the bond injury separately from the interest rate injury? Well, it's all part of our interaction. It's all part of your argument. But aren't they separate injuries? The much larger part of the injury comes from the devaluation of the collateral and the seizing of the collateral. So that's what we focused on more directly because there the plaintiff was injured to the tune of hundreds of millions of dollars. That money went from the plaintiff's pocket into the pocket of Citibank. And so it's crazy to me to stand here and listen to my friend on the other side saying, well, there's no directness. The injury is too attenuated. The money went from the plaintiff to the defendant. It's hardly indirect. And we're not asking for a limitless antitrust standing here. As I said, we're not saying that any holder of a bond that suffered a devaluation because of the LIBOR inflation has standing. If some bank on Elm Street in Centerville had foreclosed on the loan, that would be a much harder case to make. Here you have one of the price fixers taking advantage of its market manipulation to profit directly from the plaintiff. I don't know of any case saying that a directly injured party doesn't have standing to sue. There's a financial transaction here. The defendant ended up on the right side of it, the plaintiff on the wrong side. The claims are RICO claims and antitrust claims. There isn't a claim, a stand-alone claim, that they had to pay higher interest on the loans because of this. Is there such a claim in this case? No, but it's all part of the money that was paid as part of the state court. There isn't a stand-alone claim for higher interest because of the inflation of LIBOR in this case. I'm sorry to interrupt. Part of the state court judgment that the plaintiff had to pay incorporated the interest that Citibank said was unpaid, and that interest rate was higher because of— The state courts held that the interest rate was commercially reasonable. But that's because LIBOR had gone up. At the time of the state court litigation, the plaintiff didn't have any knowledge or reason to know of its RICO or LIBOR claims. Now, they say that we forfeited our claims by not raising them below, but the district court, even in this case, understood that we were raising fraudulent concealment. It held that at least inquiry notice had been delayed. With respect to both, even with respect to res judicata and the 2018 decision, the district court said, well, okay, notice inquiry was delayed until March 15, 2011. So I don't know why they're talking about 2009. The district court already held that the notice inquiry didn't happen until two years later. This court held the same in Schwab with respect to similar types of allegations, and that even that kind of notice, which was the articles about the government investigations, wasn't necessarily enough to put the plaintiff on notice of everything it needed to know to bring its claims. There's a reason plaintiffs are given some time to put together their evidence, and that reason is reflected in the Twombly arguments here. You are a fast talker, by the way. I'm sorry, yes. It won't surprise you. You're not the first person to tell me that, so I apologize. The red light is on, so I want to get it all in. We don't think this court should decide the Twombly issues in the first instance, but I would just say again that some of the defendants have admitted that they sometimes have colluded to inflate LIBOR to meet the needs of the moment, and so it's surprising to hear those allegations described as implausible. If the court doesn't have any other questions, I will stop talking quickly. Thank you both. Very lively argument.